1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHAZARUS R, HILL, SR.,                    No. C 09-3147 TEH (PR)

            Petitioner,

       v.                              ORDER DENYING PETITION FOR WRIT
                                         OF HABEAS CORPUS; DENYING
MATTHEW CATE, Secretary,                 CERTIFICATE OF APPEALABILITY

            Respondent.

_____/

       Pro se Petitioner Chazarus R. Hill, a state prisoner
incarcerated at the Correctional Training Facility located in
Soledad, California, seeks a writ of habeas corpus under 28 U.S.C.
§ 2254 to vacate his conviction after a trial by jury.  For the
reasons that follow, the Court denies the petition.

I

       On October 1, 2004, the Alameda County district attorney
filed a three-count information charging Petitioner with murder,
assault on a child causing death (child homicide) and felony child
abuse involving the infliction of great bodily harm on a child less
than five years old.  Clerk's Transcript (CT) 163-67.  Each count
carried an allegation that the victim suffered great bodily injury
and an allegation that Petitioner used a deadly or dangerous weapon,

**United States District Court**
For the Northern District of California

namely a switch or belt.  CT 163-67.  On November 28, 2006, trial by jury commenced.  CT 236.  The jury found Petitioner guilty of child homicide, felony child abuse and the lesser included offense of voluntary manslaughter on the murder count.  All the enhancements were found to be true.  CT 437-38.  On March 7, 2006, the trial court sentenced Petitioner to twenty-six years to life in prison.  CT 444.

Petitioner appealed the judgment of conviction to the California court of appeal.  Exs. 1-3.  On May 21, 2008, in an unpublished opinion, the court affirmed the judgment.  Ex. 4, <u>People v. Hill</u>, A117040 (May 21, 2008).  On August 28, 2008, the California Supreme Court summarily denied review.  Ex. 6.  On May 13, 2010, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, which summarily denied review on December 1, 2010.  Exs. 7 and 8.

Petitioner's amended federal petition alleges the following claims: (1) insufficient evidence to support his conviction for child homicide and for the jury's finding that he used a deadly or dangerous weapon in the commission of the offense; (2) improper removal of a juror; and (3) improper calculation of his time credits.  The first claim was alleged in his direct appeal. The latter two claims were alleged in his habeas petition.  On November 22, 2011, the Court found that these claims were cognizable and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Doc. #23.  Respondent has filed an answer and Petitioner has filed a traverse.

**2**

**United States District Court**
For the Northern District of California

II

The following factual background is taken from the order of the California court of appeal.

At around 2:00 a.m. on the morning of Saturday, September 20, 2003, Dr. Gail Hubbell was on duty at San Leandro Hospital when she learned that Petitioner had brought in his son, Chazarus, who was not breathing. Dr. Hubbell asked Petitioner what had happened and Petitioner replied that he had picked up Chazarus at 1:00 a.m. from his mother's house in Hayward and, at that time, he was groggy and uncommunicative. Petitioner stated that he noticed Chazarus was not breathing properly, so he splashed him with cold water. When Chazarus did not revive, Petitioner said he attempted cardiopulmonary resuscitation (CPR) before getting in the car and driving Chazarus to the hospital. Petitioner told Dr. Hubbell that he had not seen Chazarus for two weeks prior to picking him up that night from his mother.

At Petitioner's trial, Dr. Hubbell testified that, when Chazarus arrived at the hospital, he was not breathing, he had no pulse and showed no signs of life. Dr. Hubbell noted that Chazarus's body displayed signs of dependent livedo, or pooling of the blood, which is an indication that Chazarus may have been dead for a period of time. Dr. Hubbell noted that Chazarus had many bruises on his body and puncture wounds all over his legs and on one side of the body near the ear and side of the face. There were large bruises on his forehead and right cheek. Chazarus was pronounced dead at 2:45 a.m.

Dr. Paul Herrmann, a qualified expert, testified that he performed an autopsy on Chazarus the same day he died. Dr. Herrmann

3

United States District Court
For the Northern District of California

stated that Chazarus was about three-and-a-half years old at the time of death, weighed about forty pounds and measured about forty-one inches.  Dr. Herrmann noted abrasions on the right cheek, nose, forehead, upper lip, and a large bruise on the right cheek.  There was another large bruise on the right ear.

Dr. Herrmann noted multiple contusions on the left arm and left side of the chest; multiple contusions just under the nipple on the right side of the chest; and multiple patterned contusions on the lower abdominal wall, indicating that the skin had been struck with an instrument at considerable force.  He opined at trial that the contusions on the abdomen showed a pattern consistent with Chazarus having been struck with an object like a belt buckle or the toe of a shoe.

On the right side of Chazarus's back, there were contusions so numerous that they merged together.  There were scattered contusions on the left side of the back and a prominent contusion on the back of the left arm.  There were abrasions on the buttocks and numerous contusions on the thighs and legs.  Numerous scratches and abrasions on the legs were consistent with Chazarus having been hit with a tree-like switch object.

Dr. Herrmann made an incision through the scalp and peeled the scalp back from the surface of the skull to see if the skull showed signs of injury.  He found numerous contusions on the scalp that could not be seen from the outside.  Dr. Herrmann stated, "The entire undersurface of the scalp showed hemorrhage, indicating multiple blows to the head. . . . the brain showed the presence of subdural hemorrhage and subarachnoid hemorrhage, which means there

4

United States District Court
For the Northern District of California

was hemorrhage on the surface of the brain. . . . And, as a result of these injuries to the head, there was swelling of the brain. [¶] [The bruising to the body] probably was also a contribution to that swelling [of the brain], because this child had obviously lost a lot of blood in the tissues of the skin, and as a result of that, was not carrying enough oxygen to the brain, too, which caused brain swelling. [¶] But the brain swelling primarily was due to blunt injuries to the head.  And the child's death was actually caused primarily by the blunt injuries to the head and surface of the brain, with hemorrhage inside the head, with a contribution to his death from the loss of blood in the soft tissues of skin [due to the considerable contusions all over the body]."  People v. Hill, A117040 at 4.

Dr. Herrmann opined that the force of the blows to the head was "considerable, because in order to get those hemorrhages of the brain, there has to be a violent movement of the head relative to the movement of the brain."  Dr. Herrmann stated that the cause of death was "blunt trauma to the head and trunk and extremities."  On cross-examination, Dr. Herrmann opined that it was unlikely that Chazarus would have died absent the injuries to his head.

Dr. James Crawford, the Medical Director of the Center for Child Protection at the Children's Hospital of Oakland, testified as an expert in the medical evaluation of child abuse and neglect.  Dr. Crawford had reviewed various items relating to Chazarus's death, including the coroner's report, the autopsy report and accompanying photographs, medical records from San Leandro Hospital and police reports.  Dr. Crawford testified that the number of injuries on Chazarus's body was too numerous to count and that he had injuries

United States District Court

For the Northern District of California

involving the soft tissue of his body in virtually his entire body. Dr. Crawford stated that Chazarus's injuries were consistent with blunt force trauma, "meaning some type of an impact to the body that was very widely distributed that was clearly consistent with truly extreme physical abuse.  This child was quite seriously and quite systematically beaten."  People v. Hill, A117040 at 5.

Oakland Police Sergeant Mark Dunakin of the homicide unit, was assigned to investigate Chazarus's death.  He asked Petitioner and his wife, Kimberley Ford Hill (Ms. Hill), who had accompanied Petitioner to the hospital, to be transported to the police station for questioning.  At about 1:00 p.m., Sgt. Dunakin and his partner interviewed Petitioner after a Miranda advisement.  In a tape-recorded interview, played to the jury, Petitioner said that Chazarus had been staying with his mother, Tyrinza Brown, and that, in the month before taking Chazarus to the hospital, Petitioner only saw Chazarus on two brief occasions.  When Petitioner arrived at Brown's home at about 1:00 a.m. that morning, Chazarus was in Brown's arms asleep, and she just passed him to Petitioner and walked away without saying anything.  When Petitioner got back to his wife's mother's house in San Leandro, he opened the door to the car to get Chazarus out and noticed he looked lifeless.  He splashed some water on him to try to revive him, but that didn't work, so he and his wife drove Chazarus to the hospital.

In a second statement to Sgt. Dunakin, taken later that day, Petitioner admitted that he had not been truthful in his first statement.  Petitioner said that Chazarus's mother was in Los Angeles, that he had not seen her in a couple of months and that he took care of Chazarus.  Petitioner stated that he'd had a problem in

**6**

United States District Court
For the Northern District of California

the past few days with Chazarus "whining, crying and . . . talking back," so he'd been "pretty tough" with the boy.  When Petitioner gave Chazarus a "whooping," he struck him on the buttocks with the flat of his right hand, and sometimes with a belt folded in half in the middle or with a switch, which was a thin tree branch. Petitioner admitted that in the few days before Chazarus's death, he had disciplined him quite a few times with the belt and switches. Petitioner said that Chazarus's face was bruised because he accidentally ran into a wall while trying to escape a whooping. When asked how hard he punched Chazarus, Petitioner replied, "Maybe a little bit harder than I was supposed to."

Oakland Police Department civilian evidence technician Katharine Potter stated that, after a search warrant was obtained, she searched the home where Petitioner lived with his grandmother, Sadie Catching.  Potter found several switches in the bedroom that Petitioner shared with Chazarus.  She found a belt in the front of the closet door and, on top of the couch in the living room, she found a cane, wooden sticks and a belt.

Regina Bucher, another Oakland Police Department civilian investigator, searched the home of Ms. Hill's mother in San Leandro, where Ms. Hill and Petitioner also lived.[1]  Bucher found twelve switches scattered throughout the living room and several belts.

Ms. Hill testified that, before meeting Petitioner, she had five children by a man who died in a car accident.  After his death, Ms. Hill lived with her mother, Robin Ford, at Ford's house in San Leandro.  She stated that she disciplined her own children by

_____

[1] Apparently, Petitioner lived at his grandmother's house and his wife's mother's house.

**7**

United States District Court

For the Northern District of California

using time-outs, yelling at them and occasionally slapping them on the hands. She denied ever using a belt or a switch to discipline her children. When she met Petitioner, he told her that Chazarus's mother had asked him to take Chazarus because she couldn't take care of him anymore. In May 2003, Ms. Hill and Petitioner were married. At that time, Petitioner disciplined Chazarus by yelling at him. Ms. Hill stated that there were occasions when she saw Petitioner physically disciplining Chazarus and had told him "to stop doing it or to ease up a bit." Petitioner would not respond. Ms. Hill said that when Petitioner's grandmother questioned how he disciplined Chazarus, Petitioner would say, "That's my son. I do what I want to do."

Regarding events on the day Chazarus died, Ms. Hill stated that on Friday morning she and Petitioner drove over to her mother's house in San Leandro. Ms. Hill told Petitioner that she "needed some space right now" and planned to stay at her mother's house. Ms. Hill explained that she thought Petitioner needed to spend more time alone with Chazarus and would not discipline the child so much if she was not around. Petitioner reacted by yelling so loud that a park ranger came over to ask if there was a problem. After they arrived at the house in San Leandro, Petitioner made Chazarus go over his numbers. When Chazarus got the numbers wrong, Petitioner beat him with a switch. After that, Ms. Hill again told Petitioner she wanted them to separate so that he could spend more time with Chazarus. In response, Petitioner stated: "If I can't have you, I'm going to fuck him up. I don't care." Petitioner began to kick at Chazarus as Ms. Hill stood between them. Ms. Hill told Chazarus to go in the other room as she kept Petitioner at bay. Chazarus ran

United States District Court
For the Northern District of California

into Ms. Hill's mother's bedroom.  Petitioner ran around Ms. Hill after Chazarus.  Ms Hill could hear Chazarus crying and Petitioner yelling.  When Chazarus came out of the room, Ms. Hill noticed that he had a large bruise on his face and said, "Oh, my god.  Have you seen his face?  What happened?"  Ms. Hill said Petitioner put some ice on Chazarus's face.

Ms. Hill and Petitioner left the San Leandro home with Chazarus at about 7:45 p.m.  In the car, something prompted Chazarus to say to Ms. Hill, "I know.  I know.  You don't have to keep telling me that over and over again."  Petitioner heard this, got mad at Chazarus and spanked him with a switch and swatted him on the back of the head and knocked him to the floor.

Late that night, Ms. Hill told Petitioner she wanted to go to her mother's house to be by herself, but she relented to Petitioner's request that they go together.  At the San Leandro house, Petitioner got Chazarus ready for bed at around midnight. Petitioner went over numbers with Chazarus, and when Chazarus got stuck on a few numbers, Petitioner grabbed him by the shoulders and started shaking him.  Petitioner then went into the bathroom and Ms. Hill noticed that Chazarus had collapsed on the living room floor. Petitioner came out of the bathroom, saw Chazarus on the floor and started shaking him a little bit.  Ms. Hill started "tripping," and felt like she wanted to harm herself and went toward the knives in the kitchen, but Petitioner took the knives from her and tried to calm her down.  Petitioner picked up Chazarus, took him to the shower and splashed a little water on his face.  Ms. Hill said Chazarus took a couple of deep breaths and it looked like he was asleep.  Ms. Hill and Petitioner then took Chazarus to the hospital.

**9**

Ms. Hill was charged with permitting a child to suffer and be inflicted with unjustifiable pain and suffering. She plead guilty and received a sentence of four years, of which she served two-and-a-half years. She testified that the district attorney made her no promises or deals.

Aaron Bridges, who lived with Ms. Hill's mother, testified. He stated that Petitioner and Ms. Hill used to visit once or twice a week with Chazarus. A few weeks before Chazarus died, he was babysitting for Chazarus. Chazarus needed to use the bathroom and when his pants were pulled down, Bridges could see Chazarus flinching in pain. Chazarus put his finger to his mouth, made a "shushing" sound and said, "Don't say nothing. Don't tell nobody. My Daddy did this when he spanked me." Bridges said he thought about calling the police. Bridges described another time during the summer of 2003 when Petitioner, Ms. Hill and Chazarus were in the bathroom and Bridges heard Petitioner saying, "shut up," followed by two or three loud smacking sounds.

Cheryl Calhoun, a friend and neighbor of Petitioner's grandmother, testified that she had known Petitioner since he was a young boy. One time in August 2003, she went over to Cathing's house to visit and Chazarus ran to the front door to greet her. Calhoun leaned down to give Chazarus a hug, but Chazarus winced and said, "Auntie, that hurts. My Daddy socked me there," and pointed to his upper arms. Calhoun called Child Protective Services, but she got no response.

In his defense, Petitioner testified that he disciplined Chazarus by spanking him on his hands or buttocks. Petitioner admitted he had used a belt and small switches. Petitioner

United States District Court

For the Northern District of California

testified that he disciplined Chazarus for doing something wrong or being disobedient, and that he did not want to cause Chazarus pain or to hurt him.  Petitioner denied kicking Chazarus and said he never hit him on his head.  Petitioner said the injuries to Chazarus's head resulted from an incident when Chazarus ran away from Petitioner who was spanking him and then he tripped and fell into the wall.  Petitioner admitted that he lied to the police in his first interview, but said he did so because he was afraid the police would think he caused his son's death.

On cross-examination, Petitioner was asked if, in the weeks before Chazarus's death, he had seen the bruising on Chazarus's body while giving him a bath.  Petitioner replied that he had seen a couple of marks, but he didn't think they were life-threatening.  Petitioner stated that he did not cause all of the marks and bruises on Chazarus's body, but only some of them.

III

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, a federal court may not grant a writ of habeas corpus on any claim adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion

opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted).  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, ___ U.S. ___, 131 S. Ct. 1305, 1307 (2011) (citation omitted).

Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the State court's decision was objectively reasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th

Cir. 2003); <u>Greene v. Lambert</u>, 288 F.3d 1081, 1088 (9th Cir. 2002). When confronted with such a decision, a federal court should conduct an "independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law.  <u>Himes</u>, 336 F.3d at 853; <u>accord</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 970 n.16 (9th Cir. 2004).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 n.6 (9th Cir. 2002).  Because the California Supreme Court summarily denied relief on Petitioner's habeas petition, the only reasoned state court decision is the California court of appeal's May 21, 2008 denial of Petitioner's insufficient evidence claims.  Because there is no reasoned decision on the claims of improper removal of juror and improper computation of time credits, the Court independently reviews the record to determine whether the state court's denial of these claims was an unreasonable application of established federal law.

With these principles in mind regarding the standard and scope of review on federal habeas, the Court addresses Petitioner's claims.

IV

A

Petitioner claims that the child homicide conviction under California Penal Code § 273ab is not supported by sufficient evidence that the physical discipline he applied was accompanied by the necessary willfulness and knowledge of the potential for great bodily harm.  He also contends that the evidence does not support the deadly weapon enhancement under California Penal Code

13

§ 12022(b)(1).

The Due Process Clause "[p]rotects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim which, if proven, entitles him to federal habeas relief. Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing a collateral challenge to a state court conviction does not determine whether the evidence established guilt beyond a reasonable doubt. Id. at 318-19; Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court determines only "[w]hether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original). The Jackson standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004).

On habeas review, a federal court evaluating the sufficiency of the evidence under Winship and Jackson should take into consideration all of the evidence presented at trial. LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006). If confronted by a record that supports conflicting inferences, a federal habeas court "[m]ust presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor

**14**

of the prosecution, and must defer to that resolution." **Jackson**, 443 U.S. at 326.  Credibility determinations by a trier of fact are therefore entitled to near-total deference.  **Bruce v. Terhune**, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, **Jackson** does not permit a federal habeas court to revisit credibility determinations.  **Id.** at 957-58.

Under 28 U.S.C. § 2254(d), a federal habeas court applies **Jackson** and **Winship** with an additional layer of deference.  **Juan H. v. Allen**, 408 F.3d 1262, 1274 (9th Cir. 2005).  A federal habeas court must ask whether the operative state court decision "[r]eflected an 'unreasonable application of' **Jackson** and **Winship** to the facts of the case."  **Id.** at 1275 (citing 28 U.S.C. § 2254(d)(1)).

1

California's child homicide statute provides:

> Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life.

Cal. Penal Code § 273ab.

Petitioner argues that because he spanked Chazarus with belts and switches only to his body, but not his head, he cannot be guilty of murder because there is no evidence that he was responsible for the deadly blows to Chazarus's head.  He also argues that the jury's manslaughter verdict is an implied finding that he was not responsible for Chazarus's head injuries.

The state appellate court found that these claims are without merit.  It stated that a verdict of involuntary manslaughter

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

was consistent with a finding that Petitioner inflicted the deadly blows to Chazarus's head because the jury could have concluded that Petitioner struck Chazarus about the head with force that, to a reasonable person, would be likely to produce great bodily injury and could also have concluded that, in administering such force, Petitioner did not intend to kill Chazarus, that is, he lacked the requisite malice required for murder.

The state appellate court also found that there was sufficient evidence in the record for a rational trier of fact to conclude that Petitioner was responsible for Chazarus's head injuries.  The court cited the medical evidence indicating that Chazarus's brain injuries were caused by non-accidental, multiple blunt force blows to the head administered with considerable force causing violent movements of the head.  In addition to the medical evidence, Ms. Hill testified that, on the evening of Chazarus's death, she tried to stop Petitioner from kicking Chazarus, but she was unable to prevent Petitioner from pursuing Chazarus into the other room and, when Chazarus came out of the other room, he had a massive bruise on his face.  Ms. Hill also said that, later that evening, Petitioner got angry with Chazarus and swatted him on the back of the head hard enough to knock the child to the floor.  Also, Cheryl Calhoun and Aaron Bridges testified about how Chazarus told them Petitioner had beaten him around his legs and arms, leaving him in so much pain that those areas were sore and sensitive to the touch.  Against this witness testimony and medical evidence, Petitioner offered the jury his explanation that Chazarus injured his head when he ran into a wall.  However, the jury also heard Petitioner's admissions to the police about how he routinely beat

Chazarus with a belt and switch and punched him "harder than I was supposed to."

> The state court concluded:

> Given the direct evidence of the serious and extensive injuries defendant inflicted on Chazarus' body, including defendant's own admission, the jury was entitled to infer it was he who administered the fatal blows to Chazarus' head. . . . On this record, defendant may not divide and compartmentalize the evidence in an attempt to assert an insufficiency by accepting responsibility for Chazarus' bodily injuries and denying responsibility for his head injuries. Rather, viewing the record as a whole, there is ample evidence to support the jury's finding that he assaulted Chazarus to the head by 'means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death.' (§ 273ab).

<u>People v. Hill</u>, A117040 at 18-19.

The state appellate court reasonably applied the <u>Jackson</u> standard by looking at all of the evidence in the light most favorable to the prosecution and found that the record could reasonably support a finding of guilt beyond a reasonable doubt. The court considered the following evidence: Ms. Hill's testimony of Petitioner's escalating physical abuse of Chazarus; the neighbor Calhoun's testimony that when she hugged Chazarus, he winced in pain saying that his Daddy socked him in his upper arms; Petitioner's tape recorded statement that he hit Chazarus with a switch and a belt and, during one incident, when Chazarus rolled into a ball on the floor, Petitioner admitted he "body punched" Chazarus with his fists in the rib cage area; and the medical evidence that the number of injuries Chazarus received were almost too numerous to count and showed that Chazarus was seriously and systematically beaten.

United States District Court
For the Northern District of California

17

**United States District Court**

For the Northern District of California

Petitioner's argument that there was no evidence that he hit Chazarus in the head because he denied doing so is a request to review the jury's decision regarding his credibility.  However, it is well-established that Jackson does not permit a federal habeas court to revisit credibility determinations absent exceptional circumstances and there are no such circumstances here.  See Bruce, 376 F.3d at 957-58 (credibility contest between victim alleging sexual molestation and defendant's vehement denial of allegations of wrongdoing, not a basis for revisiting trier of fact's credibility determination).

After viewing the evidence in the light most favorable to the prosecution, it cannot be said that no rational trier of fact could have found that Petitioner delivered the fatal blows to Chazarus that caused his death.  See Jackson, 443 U.S. at 319.  And it cannot be said that the California court of appeal's rejection of Petitioner's insufficiency of the evidence claim was an "objectively unreasonable" application of Jackson and Winship.  Therefore, habeas relief on this claim is denied.

2

Petitioner argues that there was insufficient evidence to support the jury's finding that, in the commission of the assault, he used a deadly or dangerous weapon because the switch and belt he used are not deadly weapons and he never applied these instruments to Chazarus' head, where the fatal injuries occurred.

California Penal Code section 12022(b)(1) provides, in relevant part, "Any person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in

**United States District Court**
For the Northern District of California

the state prison for one year, unless  use of a deadly or dangerous weapon is an element of that offense."  A deadly weapon may be any object, instrument, or weapon used so as to be capable of producing, and likely to produce, death or great bodily injury.  <u>People v. Aguilar</u>, 16 Cal. 4th 1023, 1028-29 (1997).  To determine whether an object not inherently deadly or dangerous was used in the requisite manner, the trier of fact may look to the nature of the weapon, the manner of its use, and any other relevant fact.  <u>Id.</u> at 1029.  "Although neither physical contact nor injury is required for a conviction, if injuries result, the extent of such injuries and their location are relevant facts for consideration."  <u>People v. Beasly</u>, 105 Cal. App. 4th 1078, 1086 (2003).

The state appellate court denied this claim, reasoning as follows:

> The extent and severity of the injuries in this case are particularly disturbing, and the medical testimony recited above provides ample substantial evidence that the injuries to Chazarus's body were significant and substantial.  As noted above, both Doctors Herrmann and Crawford described the extensive bruising and lacerations in all parts of Chazarus's body.  Indeed, Dr. Crawford stated that the injuries on Chazarus's body were "almost too numerous to count."  Also, he described the "pattern injuries" on Chazarus's stomach indicating that he was struck repeatedly with an object.  Dr. Hubbell stated that pattern injuries were consistent with blows from a belt buckle or the toe of a shoe.  Dr. Herrmann stated that the numerous scratches and abrasions on Chazarus's legs were consistent with injuries inflicted by a "tree-like switch material."
>
> Dr. Crawford stated that from a physical standpoint, the injuries to the body "would have been very painful injuries."  This was borne out by the testimony of Aaron Bridges, who described Chazarus's limping to the bathroom and wincing in pain when his pants were pulled down.  Indeed, Dr. Herrmann stated that the extensive

1
2
3
4
5
6
7
8
9

> bruising and contusions over Chazarus's body
> were a contributory factor in his death.  As Dr.
> Herrmann explained, the bruising and contusions
> to the body caused blood loss in the soft tissue
> of the skin, reducing the blood flow and oxygen
> supply to the brain, which contributed to the
> fatal swelling in Chazarus's brain.
> Furthermore, defendant admitted to the police
> that the markings on Chazarus's abdomen were
> probably from the belt, and the markings on his
> thighs and buttocks were from the switch that
> defendant used to beat his son.  In sum, on this
> record we have no difficulty in concluding the
> evidence supports the jury's finding that
> defendant used a belt or switch in a manner
> capable of producing, and likely to produce,
> death or great bodily injury.

10   <u>People v. Hill</u>, A117040 at 19-20.

11          The record supports the state appellate court's

12   conclusion.  Oakland Police Sergeant Dunakin viewed and photographed

13   Chazarus's body at the hospital after Chazarus had been pronounced

14   dead.  5 RT at 1052-53.  Sergeant Dunakin saw obvious bruising to

15   Chazarus's abdomen and legs, lacerations on his face and buttocks

16   and marks on his legs which appeared to have been made when Chazarus

17   was hit with a belt or belt buckle.  <u>Id.</u>  At the trial, Petitioner's

18   interview with Sergeant Dunakin was played for the jury.  During the

19   interview, Petitioner admitted that he used a belt to hit Chazarus

20   in the buttocks area.  6 RT at 1169.  Petitioner also admitted that

21   he used a switch to hit Chazarus on his hands, his arms and, if he

22   had shorts on, his legs.  6 RT at 1171.  Petitioner examined

23   Sergeant Dunakin's photographs of Chazarus's body and admitted that

24   many of the red marks on the right side of Chazarus's abdominal area

25   and marks on his back were probably from a belt that he had used to

26   hit Chazarus.  6 RT at 1217, 1225.  Based on this evidence, and

27   Chazarus's injuries, the jury could reasonably conclude that

28   Petitioner used a belt or switch as a dangerous and deadly weapon in

20

United States District Court

For the Northern District of California

the commission of the assault or assaults that caused Chazarus's death.

As discussed above, under <u>Jackson</u>, 443 U.S. at 318, the critical inquiry in the due process test for sufficiency of the evidence is the determination of whether the record could reasonably support a finding of guilt beyond a reasonable doubt.  In this case, the state appellate court looked at the evidence in the light most favorable to the prosecution and correctly determined that the record could reasonably support a finding of guilt beyond a reasonable doubt.  Thus, the appellate court's decision was not contrary to or an unreasonable application of established Supreme Court authority.  Accordingly, habeas relief on this claim is denied.

B

Petitioner claims that it was improper for the trial court to have dismissed juror number five, who, at the start of the jury's deliberations, told the trial court that she had not heard large portions of the trial testimony because she was hard of hearing and did not have a hearing aid.  Petitioner contends that re-reading the testimony from the transcripts to the juror would have been more appropriate than dismissal.  Petitioner raised this claim for the first time in his petition for a writ of habeas corpus to the California Supreme Court, which summarily denied it with citations to <u>In re Dixon</u>, 41 Cal. 2d 756 (1953); <u>In re Dexter</u>, 25 Cal. 3d 921

(1979); <u>In re Swain</u>, 34 Cal. 2d 300, 304 (1949); and <u>People v. Duvall</u>, 9 Cal. 4th 464, 474 (1995).[2]

1

The following facts are taken from the reporter's transcript.

After the jury had been deliberating approximately half an hour, it sent a note to the trial court requesting that significant portions of the testimony, including opening statements, be re-read. 7 RT 1562.  The court spoke to the jury foreman to ascertain the reason for the request for the re-reading of so much testimony.  The foreperson indicated that juror number five was having problems with her hearing aid.  7 RT 1567.  The court questioned juror number five, who indicated that she did not raise her hand or indicate during the trial that she could not hear because she did not want to slow down the trial.  7 RT 1576.  She also thought that she would be able to read the transcript of the testimony after the trial had ended.  7 RT at 1576-77.  Juror number five attempted to reassure the court that she would be able to remember the demeanor of the witnesses and to be able to judge their credibility, even though she

---

[2]  <u>In re Dixon</u>, 41 Cal. 2d 756, 759 (1953), stands for the proposition that, where a claim can be brought on direct appeal, a prisoner must bring them on an appeal from the judgment before he can raise them in a habeas petition; <u>In re Dexter</u>, 25 Cal. 3d 921, 925 (1979), stands for the proposition that prisoners must exhaust administrative remedies before coming to court; <u>In re Swain</u>, 34 Cal. 2d 300, 304 (1949), stands for the proposition that a habeas petitioner must allege with particularity the facts upon which he would have his judgment vacated and that he fully disclose his reasons for delaying the presentation of those facts; and <u>People v. Duvall</u>, 9 Cal. 4th 464, 474 (1995), stands for the proposition that, in a habeas petition, conclusory allegations made without any explanation of the basis for the allegations do not warrant relief.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    would be hearing the testimony for the first time read by the court

2    reporter.  7 RT 1579-80.

3          The court spoke to the attorneys outside the presence of

4    the jury.  7 RT 1582.  The prosecutor questioned whether juror

5    number five could be fair and objective if she only heard the

6    testimony re-read and whether she could participate fully in the

7    deliberations.  7 RT 1582.  Defense counsel indicated that he

8    thought juror number five, who appeared to be outspoken, was capable

9    of deliberating after the testimony was read back to her.  7 RT at

10   1583.  He also stated that he was not particularly enthusiastic

11   about any of the alternate jurors and argued that "we have a juror

12   with a handicap who believes she can fill in the gaps."  7 RT at

13   1585.

14          In making its ruling the trial court stated:

15          [T]he request for a re-read is a very
            untraditional request for re-read.  In effect
16          it's not something that the witness heard or
            observed and wanted clarification on from the
17          record.  It's for something that the witness
            never heard before and would be hearing it for
18          the first time as the reporter re-reads it,
            without having the combination of being able to
19          gauge or judge that testimony while the witness
            was on the stand giving the testimony, using the
20          guidelines that are provided by the jury
            instructions at 2.20 and elsewhere.
21
            I also have some concern . . . that she . . .
22          did not honor the court's directive that she
            raise her hand so that we would know at the time
23          she didn't hear, and would be able to resolve
            the problem then with either re-asking the
24          question, so she could observe it coming from
            the witness, the answer, hear the question and
25          the answer as the witness gave it while making
            an observation of the witness on the stand.  She
26          didn't follow that directive.

27          . . .

28

> So, it presents multiple questions: One, we wind
> up with, should the juror continue?  Can the
> juror follow the directive of the court and
> would she be able to in the future?
>
> She's already not followed the directives of the
> court in one very significant regard . . .
>
> . . .
>
> I don't believe this would be truly re-read for
> her.  She has not heard it before, and I think
> the ends of justice at this point warrant my
> excusing her.  So, she is going to be excused,
> and we will replace her with an alternate.

7 RT at 1591-94.

The court then chose an alternate juror by putting all of their names on separate pieces of folded paper and defense counsel chose one of the folded pieces of paper.  7 RT at 1594.

2

Respondent argues that this claim is procedurally defaulted because, by denying the claim with a citation to In re Swain, 34 Cal. 2d at 304, the California Supreme Court signaled that Petitioner had failed to "disclose his reasons for delaying in the presentation of those facts."

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result

United States District Court

For the Northern District of California

in a fundamental miscarriage of justice.  Id. at 750.  California's timeliness rule is independent, Bennett v. Mueller, 322 F.3d 573, 582-83 (9th Cir. 2003), and adequate, Walker v. Martin, __ U.S. __, 131 S. Ct. 1120, 1131 (2011).  It thus may be the basis for a federal district court to hold that a claim in a federal petition that was rejected for untimeliness in the California courts is procedurally defaulted.

Petitioner argues that this claim is not procedurally defaulted because he raised it in his direct appeal as well as his 2010 petition for a writ of habeas corpus.  The Court need not address whether this claim is procedurally defaulted because, as discussed below, it fails on the merits.

3

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors.  U.S. Const. amend. VI; Irvin v. Dowd, 366 U.S. 717, 722 (1961).  A Sixth Amendment claim may be made on the ground that a particular juror was substituted without good cause.  Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997).  California's statute for discharge and substitution of jurors has been upheld as facially constitutional. Miller v. Stagner, 757 F.2d 988, 995 (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985), cert. denied, 475 U.S. 1048 (1986).[3]  This

---

[3]The statute reads, in relevant part:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations

United States District Court
For the Northern District of California

does not preclude a Sixth Amendment attack on a particular juror substitution on grounds there was not good cause for it.  Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997), cert. denied, 522 U.S. 1096 (1998).  Because on habeas review a trial court's findings regarding juror fitness are entitled to special deference, review is for manifest error.  Id. (pre-AEDPA case).

In this case, the trial court properly dismissed juror number five, who did not hear opening statements or the testimony of many witnesses, including Petitioner.  After questioning juror number five and consulting with counsel, the trial court determined that the re-reading of testimony to juror number five would put her at a disadvantage during deliberations with the other jurors because they had observed the witnesses while they heard the witnesses' testimony and, thus, they could better judge the witnesses' credibility.  The trial court was also concerned that juror number five had not followed the court's instructions and wondered if that was part of a larger issue of not being able to follow instructions in general.  The trial court did not take the issue of dismissing a juror lightly, indicating that the need to do this had arisen very rarely in his experience, but that appointing one of the alternate jurors seemed the best course to take.  The court ensured that the selection of the alternate juror was done fairly by instructing that the names of the alternate jurors be written on separate folded sheets of paper, that the separate folded sheets of paper be placed in a container and asking defense counsel to pick out one of the

---

as though the alternate juror had been selected as one of the original jurors.

Cal. Pen. Code § 1089.

**United States District Court**
For the Northern District of California

names.  Furthermore, although defense counsel indicated he was not happy with the alternate jurors, there was no indication that juror number five would have decided the case any differently than the alternate.

These facts indicate that there was good cause for the court's dismissal of juror number five based on the fact that she would be at a disadvantage in the deliberations.  Thus, Petitioner's Sixth Amendment and due process rights were not violated by the dismissal of juror number five and habeas relief on this claim is denied.

C

Petitioner asserts that, even though the trial court awarded him the correct credits for time served and for good conduct, when he reached the Sierra Conservation Camp,[4] his credits were not transferred correctly.  He asserts that his record incorrectly indicates that he is eligible for parole in 2029 instead of the correct year of 2024.

Any deprivation of time credits allegedly impacting a prisoner's sentence, i.e., impacting his or her duration of confinement, may generally only be remedied by way of habeas corpus. Young v. Kenny, 907 F.2d 874, 876-78 (9th Cir. 1989), cert. denied, 498 U.S. 1126 (1991).

California Penal Code section 2900.5(a) provides that:

> In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail, camp, work

[4] Since the time Petitioner wrote his amended petition, he was transferred to his present place of incarceration, Soledad State Prison.

United States District Court

For the Northern District of California

1
2
3
4

> furlough facility, halfway house, rehabilitation
> facility, hospital, prison, juvenile detention
> facility, or similar residential institution,
> all days of custody of the defendant, including
> days served as a condition of probation . . .
> shall be credited upon his or her term of
> imprisonment.

5      Although the deprivation of presentence credits under

6  section 2900.5 may constitute denial of a state-created liberty

7  interest that is protected by the Due Process Clause, Petitioner is

8  not claiming that he was denied the correct presentence credits.  He

9  merely claims that the correct credits awarded by the trial court

10  were not indicated on his record after he was transferred from one

11  penal institution to another.  The Court knows of no federal

12  constitutional violation that is based upon an administrative error

13  made by the state prison system.

14      Under <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991),

15  federal habeas relief is limited to violations of the Constitution,

16  laws or treaties of the United States; it is not available for

17  violations of state law or alleged errors in the application of

18  state law.  Because Petitioner's claim is not a violation of the

19  federal constitution or statutes, it is not cognizable on habeas

20  review.  This claim for habeas relief is denied.

21                                  V

22      For the foregoing reasons, the Petition for a Writ of

23  Habeas Corpus is DENIED.

24      Further, a Certificate of Appealability is DENIED.  <u>See</u>

25  Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner

26  has not made "a substantial showing of the denial of a

27  constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner

28  demonstrated that "reasonable jurists would find the district

United States District Court
For the Northern District of California

court's assessment of the constitutional claims debatable or wrong."
Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not
appeal the denial of a Certificate of Appealability in this Court
but may seek a certificate from the Court of Appeals under Rule 22
of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the
Rules Governing Section 2254 Cases.

The Clerk is directed to enter Judgment in favor of
Respondent and against Petitioner, terminate any pending motions as
moot and close the file.

IT IS SO ORDERED.

DATED   _09/17/2012_

THELTON E. HENDERSON
United States District Judge

G:\PRO-SE\TEH\HC.09\Hill-09-3145 HCDeny.wpd